IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

-----0-----

8:17CV474

CHRISTOPHER GARZA,

Petitioner,

vs.

SCOTT R. FRAKES, Director, Nebraska Department of Correctional Services,

Respondent.

-----0-----

Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254

-----0----

**PETITIONER'S MEMORANDUM BRIEF IN SUPPORT OF HABEAS RELIEF**

THOMAS C. RILEY, #13523
Douglas County Public Defender
ANNIE O. HAYDEN, #25250
Attorneys for Petitioner

H05 Civic Center
Omaha, Nebraska 68183
Telephone: (402) 444-7175
thomas.riley@douglascounty-ne.gov
ann.hayden@douglascounty-ne.gov

## GROUND 1

Petitioner Christopher Garza respectfully submits this memorandum brief in support of his petition under 28 U.S.C. § 2254, as he is being held in violation of the Eighth Amendment's ban on cruel and unusual punishment because he was a minor at the time of his offense and was sentenced to a de facto life sentence without a finding of irreparable corruption.

## STATEMENT OF THE CASE

Petitioner was convicted by jury of first degree murder and use of a knife to commit a felony on January 18, 1991. The jury found that Petitioner did on or about March 20, 1990, either with deliberate and premeditated malice or during the perpetration of, or attempt to perpetrate a robbery, burglary, or sexual assault, kill Christina M. O'Day. Petitioner was sixteen years old at the time of the offense. On February 28, 1991, he received a sentence of life imprisonment without the possibility of parole for murder and six and two-thirds to twenty years for the use charge, to be served consecutively. At this time, life without parole was the mandatory sentence prescribed by law for the murder charge and six and two-thirds to twenty years was the maximum sentence allowed for the use of a knife charge.

Petitioner appealed and the Nebraska Supreme Court affirmed his conviction on November 20, 1992.

Petitioner filed a motion for postconviction relief on May 28, 2013, after the United States Supreme Court held in *Miller v. Alabama,* 132 S.Ct. 2455 (2012), that a mandatory sentence of life without parole for minors violates the Eighth Amendment's prohibition against cruel and unusual punishment. On February 7, 2014, in *State v. Mantich,* 287 Neb. 320, 842 N.W.2d 716, the Nebraska Supreme Court held that *Miller* applies retroactively. Pursuant to these cases, the district court granted Petitioner's Motion for Postconviction relief on November 19, 2015, vacated

2

his sentence for his murder conviction, and ordered a resentencing hearing be set. The Supreme

Court then decided *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016), holding that *Miller* applied

retroactively in all cases. On February 12, 2016, Petitioner was resentenced to a period of 90 to 90

years for his murder conviction, to be served consecutively to his sentence of six and two-thirds to

twenty years for his use charge.

Petitioner appealed the district court's decision to the Nebraska Supreme Court and that

court affirmed the lower court's decision on December 30, 2016. (See Appendix A for decision).

Petitioner then filed a motion for rehearing which the court denied on February 3, 2017. Petitioner

then petitioned the United States Supreme Court for a writ of certiorari, which was denied on

October 2, 2017.

## **REASONS FOR ISSUING THE WRIT**

This issue is important because states are split on whether a lengthy term of years sentence

is equivalent to a life sentence for purposes of satisfying the constitutional requirements set forth

in *Miller* and *Montgomery*. Additionally, states are split on whether a sentencing court must make

a finding of permanent incorrigibility before imposing a life or de facto life sentence.

**I.     In recent years, the United States Supreme Court's decisions have evolved to recognize the reduced culpability of juveniles.**

In *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183 (2005), the Supreme Court ruled that

the imposition of the death penalty on juveniles violates the Eighth Amendment. The Court noted

that the death penalty was reserved for the most heinous offenders "whose extreme culpability

makes them 'the most deserving of execution.'" *Id.* at 568, quoting *Atkins v. Virginia,* 536 U.S.

304, 319, 122 S.Ct. 2242, 2251 (2002). Because juveniles have an "underdeveloped sense of

responsibility," "are more vulnerable or susceptible to negative influences and outside pressures,

3

including peer pressure," and their characters are "not as well formed" as those of adults, *id.* at 569-570, the Court ruled that juveniles categorically cannot be considered among the worst offenders and cannot be sentenced to death.

The next hallmark case of *Graham v. Florida,* 560 U.S. 48, 130 S.Ct. 2011 (2010), eliminated the punishment of life without parole for juveniles convicted of nonhomicide offenses. The Supreme Court recognized similarities between a sentence of life without parole and a death sentence, including the fact that both sentences irrevocably alter the life of the offender and deny any chance at restoration. *Id.* at 70. Since there is a strong possibility that an adolescent's moral flaws will be reformed, his or her criminal behaviors are not necessarily evidence of "irretrievably depraved character." *Id.* at 68 (quoting *Roper, supra,* at 570, 125 S.Ct. 1183).

In *Miller v. Alabama*, 132 S.Ct. 2455 (2012), the Supreme Court extended the reasoning from *Roper* and *Graham* and held that mandatory life without parole for juveniles violates the Eighth Amendment's ban against cruel and unusual punishment. This Court determined that children are constitutionally different from adults and therefore their age at the time of the crime must be considered as a mitigating factor at their sentencing hearings. *Id.* at 2469. Although *Miller* did not categorically ban the punishment of life without parole for minors, the Court did note that such a sentence should be "uncommon." *Id.* at 2469. In fact, the Court ruled that a life sentence is a disproportionate punishment except in the rare case that the child's crime reflects "irreparable corruption". *Id.* (quoting *Roper,* 543 U.S., at 573, 125 S.Ct. 1183).

## II.   Current developments in adolescent neuropsychology prove that adolescence is the most transient and risky period in one's life.

In addition to these legal expansions, current developments in adolescent neuropsychology prove that adolescence is the most transient and risky period in one's life. While common sense

4

has always suggested that adolescence is a time of transition and experimentation, the field of neuropsychology has made great strides in recent years in this area. Scientific studies have been conducted that show the precise areas of the brain that are affected by adolescence. The discussion has changed from anecdotal to research-based, and the distinctive traits of adolescence that can lead to risky behavior can no longer be denied.

In preparation for Petitioner's resentencing hearing, counsel for Petitioner took the deposition of Dr. Colleen Conoley, a prominent adolescent neuropsychologist in Nebraska. A copy of that deposition was offered and accepted as evidence in the evidentiary hearing in this case. A copy of that deposition is attached at Appendix B. Her testimony was used to educate the sentencing court regarding the general science of an adolescent's brain and was not specific to any defendant.

The widely accepted view of prominent neuropsychologists is that adolescence is a unique time because of specific alterations occurring in the brain. In its decisions concerning adolescent culpability, the United States Supreme Court frequently cites the findings of Laurence Steinberg, a renowned adolescence expert. Dr. Conoley's testimony reflects agreement with Laurence Steinberg's findings.

The two areas of the brain most affected are the socioemotional system and the cognitive control system. Laurence Steinberg, *Adolescent Development and Juvenile Justice,* 5 Annual Rev. Clinical Psychol. 459, 465 (2009)(Appendix C). The interaction of these two systems during adolescence is called the dual systems model. *Id;* (Appendix B, 50:5). This model has evolved from around the year 2000 to the present day and was developed from extensive mapping of the brains of adolescents between the ages of thirteen and nineteen. (Appendix B, 61:1-62:5). The socioemotional system is localized in the limbic and paralimbic areas of the brain, while the

cognitive control system is composed of the lateral prefrontal cortex and the parietal cortex. Steinberg, *supra.* The socioemotional system processes social and emotional information and the cognitive control system is responsible for executive functioning. *Id.*

Around the onset of puberty, there is a sudden and dramatic increase of dopaminergic activity within the socioemotional system, which causes adolescents to engage in risk-taking and reward-seeking behaviors. *Id.*; (Appendix B, 16:13-18:16). Unfortunately, the structural maturation of the cognitive control system happens much more slowly. Steinberg, *supra.* This temporal gap between the development of the two systems causes adolescents to weigh the rewards of a behavior much more heavily than the risks. *Id.* During this time, adolescents are also much more susceptible to peer influence, do not strongly consider future consequences, and have a reduced ability to self-regulate their behaviors. *Id.* They engage in "very poor decision-making that's very short-sighted, that is more reward or excitement-based than long-term outcomes or of the future." (Appendix B, 26:7-10).

These tendencies continue well beyond mid-adolescence. Steinberg, *supra.* In fact, the dopaminergic surge continues until around age nineteen or twenty, but the prefrontal cortex is not fully established until four or five years later. (Appendix B, 18:11-16).

Adolescence is a time of increased risk, but it is also a prime time for intervention. From the late teens to the early twenties is a time of extreme brain neuroplasticity. (Appendix B, 50:5). This means that psychologists and other professionals "have a very shapeable, malleable brain to work with and so intervention can mean a heck of a lot." (Appendix B, 50:18-20). This is further evidence that through the early twenties, the brain is not fixed and is constantly evolving. The brain of a sixteen year old engaging in criminal activity looks very different from that same fifteen year old's brain at the age of twenty-five.

The vast majority of adolescents that engage in criminal behavior are "adolescent-limited offenders" and do not commit criminal acts as they mature into adulthood. Steinberg, *supra.* In fact, only 5-10% of adolescent offenders turn into "life-course persistent offenders." *Id.* When an adult commits a criminal act, it can be considered characterological because his or her brain is fully developed. However, the same characterization cannot be made of an adolescent, for the behavior is developmental. As that adolescent matures, the behaviors likely will as well. If an adolescent commits his first crime after age thirteen, it is highly unlikely that he will continue to commit crimes into his twenties. (Appendix B, 58:9-11). A sentence of life without parole fails to account for this fact and deprives the adolescent of a chance at life as a law-abiding adult.

**III.    A sentence of 96 2/3 to 110 years in prison is a de facto life sentence.**

Although Petitioner was not sentenced to life imprisonment, 96 2/3 to 110 years in prison amounts to a life sentence. Petitioner is eligible for parole on August 8, 2038 and his projected release date is April 2, 2045. If he is still alive, he will be eligible for parole when he is sixty-five years, three months old. He will complete his sentence one month before his seventy-second birthday. As he entered prison at age sixteen, his entire adult life will be spent behind bars. This sentence does not provide for the "meaningful opportunity for release" required by *Miller, supra.*

Other states have found terms of imprisonment shorter than Petitioner's to be de facto life sentences. In *Casiano v. Commissioner of Correction*, 317 Conn. 52, 115 A.3d 1031 (Conn. 2015), the Connecticut Supreme Court remanded a case in which a juvenile defendant received a 50-year sentence for resentencing pursuant to the requirements set forth in *Miller*. As Connecticut has a comparable good time law to that in Nebraska, the Court declared that a defendant serving fewer than thirty years was not afforded a meaningful opportunity for release. See C.G.S.A. § 18-7a. Similarly, in *State v. Ronquillo*, 190 Wash.App.765 (2015), the Court of Appeals of Washington

7

ruled that a sentence that provided for a defendant's mandatory release at age sixty-eight was a de facto life sentence. The court also rejected the state's argument that *Miller* should not apply to aggregate sentences and remanded for resentencing. *Id.*

In *State v. Cardeilhac,* 293 Neb. 200, 876 N.W.2d 876 (2016), the Nebraska Supreme Court cited cases from other states that had differing views on what constitutes a de facto life sentence. However, the court declined to decide this issue because it ruled that the defendant in *Cardeilhac* received the benefit of an individualized sentencing hearing. *Id.* at 220, 890. In its opinion, the Court cited *State v. Zuber,* 442 N.J.Super. 611, 126 A.3d 335 (2015), in which the court ruled that a sentence is not a life sentence if the defendant will be released before the expiration of his life expectancy. However, *Zuber* was recently overturned by the New Jersey Supreme Court. The court ruled that a sentence of fifty-five years was sufficient to trigger *Miller*'s protections and that judges should not resort to general life-expectancy tables when determining the overall length of a sentence. *State v. Zuber,* 227 N.J. 422, 152 A.3d 197 (2017). Life expectancy for prisoners is drastically reduced. See *United States v. Taveras,* 436 F.Supp.2d 493, 500 (E.D.N.Y. 2006) (Life expectancy within federal prison is considerably shortened). The United States Sentencing Commission addressed this reduction in life expectancy when gathering data for average length of a life sentence in the federal system. The Commission found the average length of a life sentence to be 470 months, or just over thirty-nine years. Given that the median age at time of sentencing is twenty-five years, this means that the average life expectancy for an inmate sentenced to life imprisonment is sixty-four years. United States Sentencing Commission Annual Report: Appendix A (2012), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2012/Appendix_A.pdf. The Commission also specifically refers to a sentence of 470 months, even if not called a life sentence by the sentencing court, as a "de facto life sentence."

Life       Sentences       in       the       Federal       System       (February       2015),
http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-
surveys/miscellaneous/20150226_Life_Sentences.pdf.

Petitioner will not even be eligible for release until he is sixty-four years old, which is the
average age of death for a federal inmate. Given that he will have been incarcerated for forty-eight
out of his sixty-four years, it is highly unlikely that he will spend any meaningful life outside of
prison. This amounts to a de facto life sentence.

## IV.    The sentencing court imposed a de facto life sentence in violation of Petitioner's Eighth Amendment and due process rights.

The holding in *Miller* is premised on the fact that the Eighth Amendment prohibits
excessive sanctions, and a punishment must be proportioned to both the offender and the offense.
*Miller, supra* at 2462. Since adolescents are constitutionally less culpable than adults, a sentence
of life without parole is excessive for the vast majority of adolescents. In the rare case that a life
sentence may be imposed, *Miller* requires a sentencing judge to make a specific finding that the
minor will never be amenable to rehabilitation.

> [W]e think appropriate occasions for sentencing juveniles to this harshest possible
> penalty will be uncommon. That is especially so because of the great difficulty we
> noted in *Roper* and *Graham* of distinguishing at this early age between "the
> juvenile offender whose crime reflects unfortunate yet transient immaturity, and the
> rare juvenile offender whose crime reflects irreparable corruption." *Roper,* 543
> U.S., at 573, 125 S.Ct. 1183; *Graham,* 560 U.S., at ——, 130 S.Ct., at 2026–
> 2027. Although we do not foreclose a sentencer's ability to make that judgment in
> homicide cases, we require it to take into account how children are different, and
> how those differences counsel against irrevocably sentencing them to a lifetime in
> prison.

*Id.* at 2468-2469. This language makes it clear that the presumptive sentence must be one that
provides a meaningful opportunity for release. In order to overcome that presumption, a sentencing
judge must find that a defendant's youth did not contribute to the offense.

To impose a life sentence absent such a finding is a violation of Petitioner's due process rights. The Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 3 of the Nebraska State Constitution state in pertinent part that "No person...shall be deprived of life, liberty, or property without due process of law..." Since Petitioner's life and liberty are at stake, due process requires the sentencing court to follow procedural safeguards to ensure Petitioner's constitutional rights are not violated.

In *Montgomery v. Louisiana, supra,* the United States Supreme Court held that *Miller* announced a new substantive rule that must be applied retroactively. In reaching this decision, the Court reasoned that *Miller* does more than require a sentencer to consider an offender's youth before imposing a sentence of life without parole. *Montgomery, supra* at 731. "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects " 'unfortunate yet transient immaturity.' " *Id.* (citing *Miller,* at ——, 132 S.Ct., at 2469 (quoting *Roper,* 543 U.S., at 573, 125 S.Ct. 1183)). The Court further stated that *Miller* rendered life without parole an unconstitutional sentence for all juvenile offenders whose crimes reflect the transient immaturity of youth, and this was a substantive rule of constitutional law. *Id.* "Like other substantive rules, *Miller* is retroactive because it " 'necessarily carr[ies] a significant risk that a defendant'"—here, the vast majority of juvenile offenders—" 'faces a punishment that the law cannot impose upon him.' " *Id.* (citing *Schriro,*542 U.S., at 352, 124 S.Ct. 2519 (quoting *Bousley v. United States,* 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998))).

While *Miller* suggested that a sentencer must make a specific finding that a juvenile defendant's crime does not reflect transient immaturity before imposing a life sentence,

*Montgomery* unequivocally determined that the Eighth Amendment is violated if life without parole is imposed absent such a finding.

> A hearing where "youth and its attendant characteristics" are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not. The hearing does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity.

*Montgomery, supra* at 735 (citing *Miller, supra* at 2460).

The Iowa Supreme Court has articulated specific procedural requirements in juvenile sentencings. If a sentencing judge believes the juvenile to be the "rare and uncommon case requiring the judge to sentence the juvenile to life in prison without the possibility of parole, the judge must make specific findings of fact discussing why the record rebuts the presumption" of imposing a sentence other than life without parole. *State v. Seats,* N.W.2d 545 (Iowa 2015). The Court reiterated the findings in *Null,* 836 N.W.2d at 74-75: "In making such findings, the district court must go beyond a mere recitation of the nature of the crime, which the Supreme Court has cautioned cannot overwhelm the analysis in the context of juvenile sentencing."

Other states have recently made similar findings. An Oklahoma appellate court vacated and remanded a case for resentencing because the jury heard "no evidence pertinent to deciding whether [defendant's] crime reflected only transient immaturity or whether his crime reflected permanent incorrigibility and irreparable corruption." *Luna v. State,* 387 P.3d 956, No. F-2015-562 (Ok. Ct. Crim. App. Dec. 2, 2016). In *Veal V. State,* 298 Ga. 691, 784 S.E.2d 403 (March 21, 2016), the Georgia Supreme Court ruled that the trial court's failure to make the distinct determination on the record that defendant was irreparably corrupt or permanently incorrigible required remand since the trial court had imposed a life sentence. The court held that this determination was "necessary to put the defendant in the narrow class of juvenile murderers for

whom a life without parole sentence was proportional under the Eighth Amendment." *Id.* at 703, 412.

Because a sentence of life without parole deprives Petitioner of life and liberty interests, he had a right to due process of law. In this case, due process required the sentencer to make these specific findings on the record before imposing a life sentence. Since the sentencing judge did not find Petitioner to be the rare juvenile offender whose crime reflected irreparable corruption, he imposed a sentence that violates the Eighth Amendment's ban on cruel and unusual punishment.

> **a.      The unrefuted evidence at the evidentiary hearing showed that Petitioner is not irreparably corrupt.**

As stated above, in order to impose a life sentence, a sentencing judge must make the specific finding that the juvenile is the rare offender whose crime reflects irreparable corruption rather than transient immaturity. In this case, the judge made no such finding. In fact, the unrefuted evidence shows that Petitioner is far from the rare juvenile offender whose actions warrant a life sentence.

At a typical sentencing hearing, the judge must depend on a defendant's history and current state of functioning to determine the likelihood of rehabilitation. However, Petitioner's judge was in the unique position to have before him twenty-five years of records for review. In addition, at the evidentiary hearing prior to the resentencing hearing, Petitioner presented testimony by Dr. Kirk Newring, a licensed forensic psychologist who performed an extensive evaluation of Petitioner. That evaluation is attached as Appendix D. The sentencing judge had the opportunity to see in the flesh the 42-year-old man who had changed so drastically from the sixteen-year-old, angry boy he was when he committed this offense.

Petitioner had an extremely difficult childhood. His father was in prison from the time Petitioner was born until he reached fourth grade and then returned to prison when Petitioner was in seventh grade. When his father was home, he was extremely physically abusive toward Petitioner and his mother. The house was full of drugs and violence. Petitioner started smoking marijuana in fourth grade, did LSD for the first time in sixth grade, and tried meth and cocaine for the first time in seventh grade. Both of his parents were drug addicts and Petitioner was mostly unsupervised throughout his childhood. His father and brother both raped women when he was young, and he grew up believing that women were sexual objects. Several extended family members engaged in criminal behavior. Petitioner was consistently exposed to violence, drugs, and anger, and he had no positive role models to show him any other type of life.

Rather than allowing this incredibly traumatic childhood to define the rest of his life, Petitioner has used his time in prison to better himself and make peace with his past. Prior to sentencing, the Douglas County Adult Probation Office completed an updated Presentence Investigation Report for the judge to review. Per state law, this report remains part of the confidential record. However, the following facts regarding Petitioner and his accomplishments were contained within this Presentence Investigation Report. Petitioner has taken advantage of every program available to him through the prison system, even though he had no hope for release. He has been involved with the 7th Step program for several years. This program seeks to reduce recidivism by preparing inmates for successful release. Petitioner was the president of 7th Step for many years and now holds the position of educational coordinator. He mentors younger inmates and unincarcerated at-risk children, using his experience to encourage them not to make the same mistakes he made. He is also involved with speech clubs and cultural organizations and has earned dozens of certificates in recognition of his performance and contribution. Educationally, Petitioner

earned his GED and participated in the Inside Out program through Peru State College, where a professor teaches a class at Tecumseh State Prison and students from Peru attend the class with the inmates. He also completed a legal research class and worked as a legal aide. He has performed several jobs while incarcerated but has worked in the woodshop for the past two years. . (Exhibit D, p. 6). Inmates in the woodshop have access to tools and sharp objects, and Petitioner earned the trust necessary to work in that environment. He is also an incredibly talented artist and donates several pieces each year to benefit people in need.

Included in Petitioner's institutional records was a printout of his misconduct reports since his initial incarceration. It is important to note that inmates can earn violations for very minor infractions that would not be illegal outside of prison. Petitioner's misconduct report history reflects his maturation over the years. He earned several violations in the beginning of his incarceration. Dr. Newring, who worked for the Nebraska Department of Corrections for several years, testified that when young men first enter prison, they often feel the need to show they are tough. They frequently fight and disobey orders, and this is especially true when facing a life sentence. When there is no hope for release, some inmates feel that they have nothing to lose by acting out. When Petitioner entered prison, he was angry and scared and facing a life sentence at age sixteen. He had a distrust and disrespect for authority figures, as shown by his violations for disobeying orders. He earned his only misconduct report for assault in 1993, which is his most serious violation. As he grew older and matured, his misconduct reports decreased in frequency and severity.

Each year, inmates are scored for custody classification and parole purposes. As Dr. Newring testified at the evidentiary hearing, a score of thirty or more means the inmate is appropriate for community custody (as opposed to minimum, medium, or maximum custody) and

forty is the maximum score. Petitioner has qualified for community custody every year since 2009. These reviews are performed by prison staff that interact with Petitioner on a daily basis, and they are clearly in the best position to rate his preparedness for the community.

Numerous people submitted letters in support of Petitioner. These letters came from family members, directors of non-profits, professors, prison volunteers, inmates he has mentored, and religious leaders. These letters were submitted as part of the Presentence Investigation Report. These supporters unanimously agree that Petitioner would be a benefit to society rather than a danger. It is important to note that Petitioner proactively built this support network, even though as a child he had very little support. He has reconciled with his father, who has been out of prison since three months after Petitioner was arrested for this crime. He also is now very close with his mother, who visits him every two weeks without exception and has offered to accept Petitioner into her home if he is released.

Dr. Newring's expert opinion is that Petitioner is at low risk for future acts of violence. (Appendix D, p. 24). In order to inform his opinion, Dr. Newring reviewed Petitioner's institutional records, court documents, and original presentence investigation before evaluating him. (Appendix D, p. 2). He also spoke with Petitioner's mother to corroborate Petitioner's statements regarding his childhood. (Appendix D, p. 16). Dr. Newring was able to examine twenty-four years of records, which makes his report more reliable and less conjectural.

One of the tests Dr. Newring performed was the Psychopathy Checklist-Revised, which has been found to be the most robust predictor of the likelihood of future violence. Scores above thirty are classified as psychopathic, and Petitioner scored a 10.5, which is far lower than the inmate average of 22. (Appendix D, p. 13). He also shows no indication of sexual psychopathology. (Appendix D, p. 18). Petitioner does not suffer from any major mental disorder

15

and he has no violent attitudes. (Appendix D, p. 20). While Petitioner exhibited antisocial behaviors as a child and young adult, Dr. Newring's expert opinion is that these behaviors have peaked, and this opinion is supported by Petitioner's institutional record. (Appendix D, p. 21). Dr. Newring expects that Petitioner's antisocial behavior will continue to decrease as he ages.

Dr. Newring noted that Petitioner was very impulsive at the time he committed this offense. (Appendix D, p. 24). The combination of Petitioner's high intelligence and lack of adult supervision allowed him to do whatever he wanted with no negative consequences. (Appendix D, p. 24). The adults in Petitioner's life were abusive criminals, and he modeled his behavior after them. (Appendix D, p. 24). Dr. Newring's expert opinion is that Petitioner was unable to appreciate the risks and consequences of his actions due to his age and impulsivity. (Appendix D, p. 24). He weighed the rewards of his behaviors far more heavily than the possible negative outcomes, which is typical of sixteen-year-olds. His accomplishments over the past decade show that he is a much different man today.

In reaching his conclusion, Dr. Newring utilized tests and scientific reasoning that are widely accepted in the psychological community. Petitioner presented Dr. Newring's testimony as evidence at the evidentiary hearing, and the State presented absolutely no evidence to refute his expert opinion. Therefore, Dr. Newring's opinion that Petitioner is at low risk to reoffend and that this was an impulsive act reflecting transient adolescent immaturity is the only expert opinion before this Court. The sentencing court articulated no reasons as to why Petitioner was the rare juvenile offender whose crime did not reflect transient adolescent immaturity. In fact, the judge found the opposite to be true and specifically stated, "the Court does acknowledge and give credence to what appears to be your changed ways..." In addition, the judge considered Dr. Newring's report, certificates earned by Petitioner, and Petitioner's letters of support to be

16

mitigating factors in this case. These findings preclude a life sentence under *Miller*.  The fact that the sentencing judge believed Petitioner's adolescent behavior was not consistent with the man he has become shows that the court sentenced based on the crime and not the offender.

## CONCLUSION

The sentencing court violated Petitioner's Eighth Amendment rights against cruel and unusual punishment by sentencing him to a de facto life sentence absent a finding of irreparable corruption. Petitioner prays this Court issue a Writ of Habeas Corpus to remedy this constitutional violation.

RESPECTFULLY SUBMITTED:

Thomas C. Riley, #13523
Douglas County Public Defender
Annie O. Hayden, #25250
Assistant Public Defender
Attorneys for Petitioner

17